Edith C. Lindquist and Agnes Lindstrom, Appellees, v. Friedman's Inc. and Maurice Friedman, Appellants.

Gen. No. 38,696.

McSurely, P. J., dissenting.

Opinion filed April 20, 1936.

Max M. & Samuel Grossman, of Chicago, for appellants; Sid Mogul, of Chicago, of counsel.

Schofield & Wood, of Chicago, for appellees; Frank Schofield and David H. Kraft, of Chicago, of counsel.

Mr. Justice O'Connor delivered the opinion of the court.

Plaintiffs brought an action against the defendants to recover damages for an alleged false arrest and imprisonment. There was a jury trial and a verdict in favor of each plaintiff and against the defendants for $1,000. Upon a remittitur of $250 on each verdict a judgment was entered on the verdicts for $750 in favor of each plaintiff, and defendants appeal.

The record discloses that on Saturday, March 24, 1934, at about 3:15 p. m., plaintiff Agnes Lindstrom, accompanied by her aunt, Edith C. Lindquist, the other plaintiff, entered defendant Friedman's Inc. department store located in the northwest section of Chicago, to shop. Miss Lindstrom made a two-dollar purchase of some silk for which she paid; they then went to another counter where Miss Lindstrom made another purchase which amounted to $3.74; she handed the saleswoman a five-dollar bill; the saleswoman examined it and pronounced it a counterfeit; the bill was then shown to the cashier and then to defendant Maurice Friedman, who was president of the defendant corporation and managed the department store. He went over to the counter where plaintiffs were standing, told them the bill was counterfeit; that he had notified the police who were coming to the store in a few minutes and that plaintiffs would have to wait until the police arrived. There is some dispute (which will be hereinafter referred to) as to what was said and done at the time. About 10 or 15 minutes later two uniformed policemen came into the store and were shown plaintiffs, who were still standing at the counter; after some questions the policemen and defendant Friedman went to the president's office on the same floor and some further questions were asked; thereupon, the policemen told plaintiffs they would have to go to the police station and they all went out; plaintiffs and the two officers got into the police patrol and were driven to

the station six or seven blocks from the department store. A few minutes thereafter the parties were followed by Friedman; they were interrogated by police officers at the police station, who then notified a government official in charge of investigating matters in connection with the passing of counterfeit bills, and about a half hour afterward two employees of the government came and after questioning plaintiffs and being satisfied they were entirely innocent of any wrongdoing, told them they could go home, and plaintiffs walked to their home, a distance of about five blocks.

Plaintiff Lindstrom testified that she was 33 years old and at the time of the occurrence in question lived with her aunt, the other plaintiff, and the aunt's brother, about five or six blocks from defendants' department store; that prior to and at the time of the difficulty she was employed continuously for about 15 years as a stenographer by Fleishman Transportation Company at 327 S. LaSalle street, and was receiving $27 a week, her salary being paid twice a month by check; that for a number of years she had lived in the vicinity of defendants' store where she had been dealing for about 14 years; that she had a "nodding acquaintance" with defendant, Friedman; that about 10 days prior to the arrest she had taken her check for two weeks' salary, deposited part of the proceeds in the Harris Trust & Savings Bank, and at the time she went to defendants' store she had about $20 in currency in her purse. After detailing the two purchases made by her she further testified that defendant Friedman came to where she was standing at the counter, with the five-dollar bill in his hands, and said, "I have called the police. You will have to wait here"; that there were a good many customers in the store at the time; that Friedman stood near plaintiffs until two uniformed policemen arrived some 15 or 20 minutes later; that all the parties then went into Mr. Friedman's office in the store, which was about 50 feet from

where they had been standing; that the police stated the counterfeit bill was a "pretty good bill," and that Mr. Friedman said plaintiffs would have to go to the station with the police officers who wanted to take the matter up with other police officers at the station; that the officers asked plaintiffs their names, where they lived and where they worked; that the officers then stated they would all have to go to the station; that she then asked Mr. Friedman if they were going with him in his car or with the police officers, and Mr. Friedman said they would have to go with the officers; that a number of customers were looking at them and that they then went out of the store, got in the police squad car which was parked around the corner, and were driven to the station; that they were taken to the lieutenant's office where they were questioned, and shortly thereafter Mr. Friedman came into the office; that the officer asked their names, where they thought they got the five-dollar bill, and were told where the plaintiffs worked, and that during the questioning Mr. Friedman was present; that about 20 minutes later two government men came, having been telephoned for by the police, and after plaintiffs were interrogated by these men the police telephoned to plaintiff Lindstrom's employer and told him that the women were held at the Summerdale police station for passing a counterfeit bill, and the office advised that plaintiff Lindstrom had worked for them for 14 years and was still employed there; that Mr. Friedman stayed about five minutes while the questioning was going on and then left; that about five o'clock the officers told plaintiffs they could go home, which they did.

Edith C. Lindquist, the other plaintiff, testified she was 45 years old and at the time of the trial was employed by the United States Government in the Internal Revenue department, but was not employed at the time of her arrest; that she was born in Chicago and had lived there continuously. Her further testi-

mony is substantially the same as that of her niece, the other plaintiff. Plaintiffs both testified they were very much embarrassed, disturbed and nervous at the time in question and for a considerable time thereafter.

The five-dollar bill was pronounced counterfeit, retained by the government officials and is in the record. We think very few people receiving it would have noticed that it was not genuine.

Irene Gutch, the saleslady who waited on plaintiff at the time but who was not employed by defendants at the time of the trial, called by defendants, testified that about a week before, one of the girls in the store had received a five-dollar counterfeit bill and the employees were all informed to thereafter look at such bills closely; that upon receiving the five-dollar bill from plaintiff she took the matter up with the cashier; that Mr. Friedman came over to the counter and said to plaintiff, ''I am sorry, Madam, but we cannot accept this bill because it is a counterfeit. The only thing we can do is turn it over to the authorities''; and that the authorities would give plaintiff a receipt for it. She further testified that Friedman told another employee to notify the authorities and then walked away toward the front of the store; that the two women remained standing at her counter for about 10 minutes, when two uniformed police officers came; that Mr. Friedman took them to where the women were standing and at Friedman's suggestion they all went into Mr. Friedman's private office and after some questioning she testified she had worked at defendants' store for about three years and did not know either plaintiff.

Thomas Cleary, one of the police officers called by defendants, testified that on the day in question a call came to the Summerdale police station and he and another officer took a squad car and went to defendants' department store, a distance of about four blocks; that they parked their car, went into the store, someone met them at the door and told them someone had at-

tempted to pass a counterfeit bill; Mr. Friedman came over, talked to them and took them to where plaintiffs were standing at the counter; that he asked plaintiffs where they got the bill and was told at the Continental Bank, but one of the plaintiffs said she might have got it at a millinery store where she bought a hat; that they then went to Mr. Friedman's office, which was near the back of the store, because people started to look and wanted to listen to the conversation; that when they went into the office he informed plaintiffs they would take them to the station where they would notify the government officials because the police did not handle counterfeit cases; that they took plaintiffs in their squad car to the station where their superior officer would look into the matter; that he told Friedman he had better come to the station and talk the matter over with the lieutenant. Shortly after they got to the station Mr. Friedman came in; that there was considerable counterfeit money being passed at that time and the police had several calls in such matters; that the lieutenant took charge of the matter and Mr. Friedman explained what had taken place at the store; about 10 minutes later the government men arrived and took charge of the matter.

Other witnesses gave testimony substantially to the same effect. It is conceded that plaintiffs were law-abiding citizens and had done nothing wrong in offering the five-dollar bill in payment of merchandise purchased.

In Cooley on Torts (4th ed.) vol. 1, sec. 109, page 345, it is said: "False imprisonment is a wrong akin to the wrongs of assault and battery, and consists in imposing, by force or threats, an unlawful restraint upon a man's freedom of locomotion. *Prima facie* any restraint put by fear or force upon the actions of another is unlawful and constitutes a false imprisonment, unless a showing of justification makes it a true

or legal imprisonment. False imprisonment is necessarily a wrongful interference with the personal liberty of an individual.''

In *Schramko v. Boston Store of Chicago,* 243 Ill. App. 251, which was an action to recover damages for alleged false arrest and imprisonment, where plaintiff was charged with stealing jewelry while in a department store, was apprehended by an officer and interrogated and then permitted to go, we said (p. 256): ''False imprisonment is 'any unlawful exercise or show of force, by which a person is compelled to remain where he does not wish to remain, or to go where he does not wish to go.' *Durgin v. Cohen,* 168 Minn. 77, 209 N. W. 532. False imprisonment is 'the unlawful restraint by one person of the physical liberty of another. The true test seems to be, not the extent of the restraint, but the lawfulness thereof.' *Weiler v. Herzfeld-Phillipson Co.,* 89 Wis. 554, 208 N. W. 599.'' And continuing we said (pp. 256, 257): ''It has been held that the arrest of a private person without process is trespass if no criminal offense was committed or attempted in the presence of the officer, whether he had probable cause or not to believe the arrested person guilty. *Hight v. Naylor,* 86 Ill. App. 508. Such arrest can be justified only by proving actual guilt of the party. *Siegel, Cooper & Co. v. Connor,* 70 Ill. App. 116; *Kindred v. Stitt,* 51 Ill. 401.''

From the foregoing statements of the law in this State it is obvious that plaintiffs were falsely imprisoned and their arrest illegal when defendants caused them to remain in their store until the police arrived. And since the evidence shows, and it is conceded, that plaintiffs were entirely innocent, the arrest and imprisonment were not justified.

In *Enright v. Gibson,* 219 Ill. 550, in an action for false imprisonment against a private individual for arresting or causing an officer to arrest a person with-

out a warrant, it was held that the defendant could justify the arrest when it is shown that a crime was committed and that the plaintiff was guilty of the crime. In that case suit was brought for false imprisonment and malicious prosecution. The court there said (p. 553) : ''By the common law, and according to the holdings in many of the States, a private person may justify an arrest by showing that a felony had actually been committed and that he had reasonable grounds to suspect that the person arrested committed the felony. . . . By section 4 of division 6 of our Criminal Code (Hurd's Stats. 1903, par. 342, p. 677) it is provided: 'An arrest may be made by an officer or by a private person without warrant for a criminal offense committed or attempted in his presence, and by an officer when a criminal offense has in fact been committed, and he has reasonable ground for believing that the person to be arrested has committed it.' '' (That statute is still in force, par. 681, ch. 38, Ill. State Bar Stats. 1935.) ''From the reading of this statute it would seem that there is pointed out a distinction between the power of a citizen to make an arrest and that of an officer. A citizen may arrest when an offense is committed or attempted to be committed in his presence; so, too, may an officer under the same circumstances. But an officer may also arrest where the criminal offense has in fact been committed and he has reasonable grounds for believing the person arrested has committed it. But this latter power is not extended to a citizen by the statute.'' And continuing (p. 555) the court quoted from *Dodds v. Board,* 43 Ill. 95, '' 'To hold this plea good as a justification to the persons causing the arrest would be to hold that private individuals might arrest on probable cause to believe that the party was guilty, as the arrest thus caused is, in principle, precisely the same as if the arrest had been made by a private person. The mere

fact that they induced even an officer, without a war-rant to make the arrest does not protect them. They do not act under the direction of the officer, but he under theirs. Whilst in such a case the officer, acting upon facts reasonably calculated to raise the presumption of guilt, would no doubt be protected, the party causing him to make the arrest would not be unless guilt were shown.'" And continuing (p. 556): "We think this case [*Dodds v. Board,* 43 Ill. 95] a clear announcement of the rule in this State that before a private citizen can justify an arrest made by him, he must show not only that a crime has in fact been committed, but that the person arrested is guilty of the crime. [Citing authorities.] These cases, as we think, are in keeping with the provisions of the statute above quoted." This rule has been consistently followed by our Supreme Court. *People v. McGurn,* 341 Ill. 632. Defendants having caused plaintiffs' arrest and false imprisonment by detaining them in the store and having them taken to the police station, plaintiffs being entirely innocent, there was no defense to this case.

Defendants contend that there is no evidence in the record that plaintiffs were taken to the police station by the officers at the direction of defendants, but on the contrary, plaintiffs were taken by the officers to the station on their own initiative and therefore the admission of evidence as to conversations that took place at the police station outside of the presence of defendant Friedman should have been excluded. We think the question whether plaintiffs were taken to the station by the police at defendants' direction or request, was, at most, a question of fact for the jury, and in these circumstances the evidence was admissible. Moreover, as said in *Enright v. Gibson,* 219 Ill. 550, from which we have above quoted, "The mere fact that they induced even an officer, without a warrant, to make the arrest does not protect them."

Defendants further contend the damages awarded were so excessive as to warrant the conclusion that the jury was actuated by prejudice and passion. The jury was instructed at defendants' request that it had the "right to consider whether or not the defendants, . . . acted in good faith with honest intentions and with prudence and proper caution, and if you so find from the evidence, then you cannot assess punitive or exemplary damages against the defendants, or either of them." We think the jury might properly find that defendants did not act with "prudence and proper caution." It seems clear that if Friedman or defendants' other employees had made but a little investigation at the time of the passing of the five-dollar bill, it could have been ascertained without difficulty that plaintiffs were entirely innocent. Failure to investigate, resulting in unlawful imprisonment, connotes malice. *Hirsch v. Feeney*, 83 Ill. 548.

In *Coolahan v. Marshall Field & Co.*, 159 Ill. App. 466, plaintiff, who was in defendant's store, was taken into custody by employees of the store who claimed plaintiff had stolen a handkerchief. She was detained, questioned and searched and shortly thereafter discharged on the ground that a mistake had been made. She brought suit for arrest and false imprisonment and a judgment for $750 was held not to be excessive.

Upon a careful consideration of all the evidence in the record, we are of opinion the judgment entered in favor of each plaintiff, instead of being excessive, "is very moderate." *Ryan v. Donnelly*, 71 Ill. 100.

The judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

MATCHETT, J., concurs.
McSURELY, P. J., dissents.