**Earl HYATT, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 91 CV 0711 (SJ).**

United States District Court,
E.D. New York.

June 25, 1997.

Yannelli, Zevin & Civardi, LLP, by Marvin Zevin, Mineola, NY, for Plaintiff.

Zachary W. Carter, United States Attorney, Eastern District of New York, by Kevan Cleary, Assistant U.S. Attorney, Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

JOHNSON, District Judge.

Earl Abraham Hyatt ("plaintiff") has brought this action against the United States of America ("government" or "defendant") pursuant to the Federal Tort Claims Act for false arrest, false imprisonment, malicious prosecution, negligence, and gross negligence. A bench trial was conducted on June 10 and 11, 1996. In addition to arguing that plaintiff failed to establish his cause of action at trial, the government moved to dismiss the complaint as time-barred. The Court reserved decision on that motion, as well as on the merits of the case.

For the reasons stated below, the Court finds that plaintiff's claims are not time-barred, and that plaintiff proved his claim for false imprisonment at trial.

## PROCEDURAL BACKGROUND

Plaintiff brought this action based largely on the government's mistaken imprisonment of him from May 25 to September 7, 1990. On March 1, 1991, plaintiff filed his initial complaint with this Court against the United States of America, the Drug Enforcement Agency ("DEA"), DEA Agent Robert Fanter, and other unknown DEA agents and federal agencies, pursuant to the Federal Tort Claims Act ("FTCA") and the Fourth, Fifth, and Eighth Amendments of the U.S. Constitution. Plaintiff then filed an administrative claim with the DEA on June 14, 1991. The DEA denied plaintiff's administrative claim on January 23, 1992, and after the government answered the complaint on February 11, 1992, the parties moved forward with discovery from the spring of 1992 until the spring of 1993.

The government subsequently moved for summary judgment. Pursuant to this Court's Memorandum and Order dated October 28, 1994 ("Memorandum and Order"), plaintiff's claims were all dismissed, and plaintiff's attorney was directed to pay the costs of the motion. Specifically, the Court found in part that it lacked subject matter jurisdiction over the FTCA claims contained in plaintiff's initial March 1, 1991 complaint, because that action was commenced before satisfaction of the administrative exhaustion requirement under 28 U.S.C. § 2675(a) ("Section 2675(a)"). As stated in the Court's Memorandum and Order, "because the FTCA constitutes a waiver of sovereign immunity, the procedures set forth in Section 2675 must be adhered to strictly." Memorandum and Order at 11 (quoting *Keene Corp. v. United States,* 700 F.2d 836, 841 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983)). Plaintiff had failed to meet the requirements of Section 2675(a) when he filed his complaint prior to filing his administrative claim with the DEA, and the Court therefore lacked subject matter jurisdiction over the FTCA claims. *See McNeil v. United States,* 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). The Court, however, permitted plaintiff to replead his FTCA claims against the United States, and plaintiff therefore filed an amended complaint based on a single FTCA

cause of action against the United States on November 9, 1994.

The government's initial response to the amended complaint was a motion to dismiss filed prior to trial but fully briefed only after trial. The Court reserved its decision on that motion, and conducted a bench trial in June 1996. The parties submitted post-trial briefs in August and September 1996.

## DISCUSSION

### I. *Motion to Dismiss the Complaint as Time–Barred.*

As discussed above, the Court lacked subject matter jurisdiction over plaintiff's initial FTCA claims because they were prematurely filed and plaintiff therefore failed to meet the requirements of Section 2675(a).

The United States argues that the Court also lacks the jurisdiction to consider the single cause of action in plaintiff's amended complaint. Specifically, defendant cites 28 U.S.C. § 2401(b) ("Section 2401(b)") which states:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

Section 2401(b). The government points out, and plaintiff apparently agrees, that both requirements set forth in the above-quoted paragraph must be satisfied by a plaintiff bringing a tort claim against the United States. *See Willis v. United States,* 719 F.2d 608, 612 (1983). Because the DEA denied plaintiff's administrative claim on January 23, 1992, the government argues that plaintiff had only until July 23, 1992 to bring his complaint. Plaintiff filed his amended complaint, however, pursuant to this Court's Memorandum and Order, on November 9, 1994, long after the six-month statute of limitations had passed. The government therefore concludes that the single FTCA cause of action contained in plaintiff's amended complaint is time-barred. In short, defendant

asserts, plaintiff's first March 1, 1991 complaint was filed too early, and his November 9, 1994 amended complaint was filed too late.

Plaintiff argues in response that unlike the jurisdictional requirements codified at Section 2675(a) which cannot be waived, the statute of limitations contained in Section 2401(b) constitutes an affirmative defense which defendant must prove and plead. Specifically, plaintiff argues that the defendant completely waived its statute of limitations defense. This argument is without merit. Even if the waiver of Section 2401(b) as a principle were appropriate, defendant made no such waiver in this case. As its initial response to the amended complaint, defendant filed a motion to dismiss the amended complaint based precisely on the argument that plaintiff failed to satisfy the statute of limitations requirement of Section 2401(b).

■ More persuasive is plaintiff's argument that the statute of limitations of Section 2401(b) is subject to equitable tolling, and should be tolled in the instant case.

The Second Circuit has indicated that the temporal boundaries set forth in Section 2401(b) are jurisdictional requirements. *Long Island Radio Company v. NLRB,* 841 F.2d 474, 477 (2d Cir.1988) ("Where a statute authorizing a claim against the United States contains time limits for filing the claim, those limits set the temporal boundaries of the consent to be sued; they grant the tribunal in which the claim is to be filed jurisdiction to entertain only those claims that are filed within the time allowed by the statute.") (citing, among others, *Leonhard v. United States,* 633 F.2d 599, 624 (2d Cir.1980) (a suit brought under the FTCA), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981)). Since that indication, however, the Supreme Court has stated that the principle of equitable tolling should apply to suits brought against the government under statutes that waive sovereign immunity. The Court stated:

> Once Congress has made such a waiver, we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if

any, broadening of the congressional waiver.... We therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States.

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435 (1990).

In accord with *Irwin*, several circuit courts of appeals have found that the time requirements of Section 2401(b) may be equitably tolled. *See, e.g., Alvarez–Machain v. United States*, 107 F.3d 696, 701 (9th Cir.1996); *Glarner v. United States*, 30 F.3d 697, 701 (6th Cir.1994); *Krueger v. Saiki*, 19 F.3d 1285, 1286 (8th Cir.), *cert. denied*, 513 U.S. 905, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994). *See also Lambert v. United States*, 44 F.3d 296, 298–99 (5th Cir.1995) (implying that equitable tolling may be appropriate in some FTCA suits, albeit not the instant one); *Benge v. United States*, 17 F.3d 1286, 1288 (10th Cir.1994) (same); *Long v. Card*, 882 F.Supp. 1285, 1287–88 (E.D.N.Y.1995) (same). It is therefore appropriate for this Court to consider plaintiff's contention that the statute of limitations should be equitably tolled in the instant case.

Plaintiff specifically contends that defendant's attorney affirmatively acted to induce plaintiff not to file a complaint within the six-month period following his receipt of the denial of his administrative claim, and this Court finds that some form of such an express statement was actually made by the government and relied upon by plaintiff's attorney.[1] Civardi Aff. ¶ 8 ("[Defendant's attorney] explicitly indicated to me that he would not file the answer until after the administrative claim had been denied. He stated to me, '.... I could force you to refile the complaint, but I'm not gonna do that.'"). Such an express inducement by the government's attorney was not relevant to this Court's earlier decision regarding plaintiff's satisfaction of the requirements of Section 2675, because that section of the statute

conveys subject matter jurisdiction on this Court and is not subject to waiver or equitable considerations. *See* Memorandum and Order at 14–15. For purposes of the current motion, however, and particularly regarding plaintiff's argument that the Section 2401(b) statute of limitations should be tolled, this Court may consider defendant's representation to plaintiff's attorney that he did not need to refile the complaint after receipt of the administrative denial.

■ In particular, the Court considers this fact in the context of other circumstances of this case and in light of the purpose of a statute of limitations. Although "[f]ederal courts typically extend[ ] equitable relief only sparingly[,]" equitable tolling may be appropriate in situations "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. at 96, 111 S.Ct. at 458 (footnotes omitted).

In the instant case, plaintiff did actively pursue his judicial remedies by conducting discovery with his adversary during the statutory period, and this Court has found that plaintiff was induced not to refile the complaint after the administrative denial. Equally important, the purposes of Section 2401(b) are still satisfied if equitable tolling is applied to this case. Specifically, the government was put on notice in as early as March 1991 to defend against this action, and the fact that discovery was conducted within the statutory period meant that both defendant and the Court were successfully protected from having to deal with a case in which the search for truth might otherwise have been seriously impaired by the loss of evidence. *See United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979). In short, the "obvious purpose" of Section 2401(b), in encouraging prompt presentation of claims, is still served if equitable

---

1. The government's actions are consistent with a finding that the government expressly told plaintiff that he did not need to refile the complaint after the administrative denial. Specifically, the government answered the March 1, 1991 complaint on February 7, 1992, shortly after the final administrative denial dated January 23, 1992, without waiting for plaintiff to refile the complaint.

tolling is applied in this case. *See id.* (citations omitted).

Considering all of these factors, the Court finds that equitable tolling is appropriate in the instant case, and that plaintiff's November 9, 1994 filing of the amended complaint—just twelve days after the government's motion for dismissal of the original complaint was decided by the Court—satisfies the requirements of Section 2401(b).[2] Defendant's motion to dismiss the complaint as time-barred is therefore denied.

## II. *Findings of Fact and Conclusions of Law.*

The Court makes the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

### A. *Findings of Fact.*

The plaintiff in this case is Earl Abraham Hyatt ("Plaintiff Hyatt" or "plaintiff"), and although he was born in Jamaica in 1949, he lived in Belize City, Belize from August 1976 until 1982, when he entered the United States on a C–1 visa. Tr. at 104, 108.[3] On one occasion in 1980, Plaintiff Hyatt had attempted to enter the United States through the Mexican border for a two-week religious crusade, but was not allowed to enter at that time because he could not afford the $3,000 bond required for his entry. Tr. at 105–06. According to plaintiff, shortly after he was denied entry, he walked over to a telephone a short distance away and was suddenly apprehended by the Immigration and Naturalization Service ("INS") for having entered the United States illegally. Tr. at 106. While the INS record supports plaintiff's assertion, his 1980 entry into this country is important to this case solely because it prompted the creation of an INS

record—a record which, unfortunately for plaintiff, mistakenly became part of an ongoing criminal investigation in Chicago.

That investigation was handled by DEA agents Robert E. Fanter ("Fanter" or "Agent Fanter") and Wayne Kowalski ("Kowalski" or "Agent Kowalski"), and its focus was on a marijuana smuggling ring that was being run by a man named Erroll Hyatt ("Suspect Hyatt"). Fanter and Kowalski had begun investigating the smuggling ring since at least 1981, when an informant introduced undercover Agent Fanter to Erroll Hyatt. Tr. at 2. Fanter met with Erroll Hyatt at a coffee shop at a Sheridan Inn in July 1981. Tr. at 2. At that meeting, Agent Fanter sat directly across from Erroll Hyatt as they spoke for an hour about the possibility of Fanter helping him smuggle marijuana into Chicago. Tr. at 20. Although Fanter never saw Erroll Hyatt again after that meeting, he prepared a report for the DEA file shortly thereafter and described the man he had met as *"Earl* Hyatt," who was medium complected and residing in Jamaica. Tr. at 6–7.

In addition to Fanter's description, Agent Kowalski also included a description of Suspect Hyatt in the DEA file, from information he received during an informant interview in the fall of 1981. Agent Kowalski noted that the informant, who knew the suspect, described *"Earl* Hyatt" as approximately thirty years old, five foot nine inches tall, 150 pounds, and with black hair and brown eyes. Tr. at 39. Kowalski also noted that the informant had provided the telephone number 925–4426 for the suspect in Kingston. Tr. at 39. Finally, Agent Kowalski testified at trial that the DEA reports all consistently indicated that Suspect Hyatt resided in Ja-

---

**2.** The Court is not unaware that the circumstances of *McNeil v. United States*, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993), in which the Supreme Court affirmed the dismissal of plaintiff's FTCA claims, are similar to the instant case. That is, in both cases, the complaint was filed prior to the administrative claim. The plaintiff in *McNeil*, however, unlike plaintiff here, had never refiled his complaint after the administrative denial. Second, there was no indication in *McNeil* that the government's attorney induced plaintiff not to refile his complaint

after the administrative denial. Finally, the Supreme Court addressed only McNeil's failure to satisfy the jurisdictional requirement of Section 2675 and specifically refrained from discussing whether he had satisfied the Section 2401(b) requirements. *Id.* at 110–11 & n. 5, 113 S.Ct. at 1982–83 & n. 5.

**3.** "Tr. at" refers to the transcript of the bench trial conducted in this case on June 10 and 11, 1996.

maica, and that he was ostensibly in the clothing business there. Tr. at 40.

Despite this very specific information on how Suspect Hyatt could be reached in Kingston, Agent Kowalski did not recall whether anyone had actually tried to contact the suspect or to confirm the phone number that the informant had provided. Tr. at 40. Kowalski knew of no effort by the DEA in Kingston to photograph the person located at the phone number. Tr. at 41. Finally, Agent Kowalski testified that although he was responsible for putting the case together for presentation to the grand jury, he had placed only one request to the DEA office in Kingston to identify the suspect "Earl" Hyatt, and he had no idea how much, if any, effort had been made on that request because he never got a reply back from the Kingston office representative, and never made any additional requests. Tr. at 51–52.

Although the DEA made no effort to locate or further identify Suspect Hyatt, Agent Kowalski did eventually obtain an INS report regarding an "Earl A. Hyatt" in August 1982. Tr. at 35, 57; Ex. BB. That report concerned the plaintiff in this case, and indicated that "Earl A. Hyatt," although born in Clarinda, Jamaica, resided in 1980 at 92 New Road, Belize City, Belize. Tr. at 63–64. The report also included a photograph of "Earl A. Hyatt," which Agent Kowalski showed to Agent Fanter to see whether Fanter could identify the person in the photograph as being the person with whom he had negotiated at the Sheridan Inn in July 1981. Tr. at 35, 62–63. Agent Kowalski testified that when he showed Agent Fanter the picture in August 1982—over one year after Fanter had met for just one hour with Suspect Hyatt—Agent Fanter indicated that the INS photograph depicted the target of their investigation, "Earl" Hyatt. Tr. at 37, 63. Agent Kowalski, however, did not testify as to the amount of confidence with which Agent Fanter made the identification, and Agent Fanter himself stated at trial that he was not sure if he had made the photo identification positively. Tr. at 9 ("I don't recall if [the identification was] positive or not. I might have said looked like the guy. I don't know if [it was] 100 percent.").

Based on at least some possibility that the Earl Hyatt of the INS report was Suspect Hyatt, Kowalski incorporated the INS information into the DEA file as accurate and definite information that he had obtained regarding Suspect Hyatt. *See, e.g.,* Tr. at 52 (referring to the suspect from then on as "Earl *A.* Hyatt").

As a result of the DEA investigation, an indictment was handed down in April 1983 for Earl Hyatt, as well as James Anderson, Aubrey Graham, and Everett Tracy, in the United States District Court, Northern District of Illinois. Tr. at 65, 75; Ex. W. On October 12, 1983, based on that indictment, an arrest warrant was issued by the same court. Tr. at 25; Ex. EE. That arrest warrant included the address which Plaintiff Hyatt had provided to the INS in 1980, which was 92 New Road, Belize City. Tr. at 25–26. It also mistakenly indicated, however, that Belize City was located in Jamaica, rather than in the country of Belize. Tr. at 65; Ex. EE. Although the arrest warrant was issued, apparently little or no action was taken on it, as shown by the fact that there was never a correction of the warrant's error indicating that that there is a Belize City on the island of Jamaica.

Action was taken, however, with regard to Suspect Hyatt's coconspirators and pursuant to the April 1983 indictment. Specifically, James Anderson ("Anderson") went to Chicago in 1984 to plead guilty to his charges, and also to serve as a witness in the trial of Everett Tracy, who was tried in the Northern District of Illinois in February 1984. Tr. at 153, 158, 178.

Anderson had actually been cooperating with the Chicago DEA's investigation since 1981, and had met with Agent Kowalski in 1981 to inform him about the smuggling operation and to provide details regarding who was involved and how it worked. Tr. at 174–76. Anderson testified at the trial of the instant case that he first met Suspect Hyatt in 1980 everyday for about three or four days when they were both staying at the Intercontinental Hotel in Kingston, Jamaica. At that time, Suspect Hyatt appeared to be a Jamaican Black, approximately five foot nine

inches tall, and of medium complection. Tr. at 139–41.

Anderson also testified that when he met with Erroll Hyatt again in 1983, the suspect's appearance had changed significantly. Specifically, Anderson testified that as a result of an accident, Suspect Hyatt had deep scars on his face, and had lost his left eye. Tr. at 141. Although Erroll Hyatt had been wearing an eye patch at this meeting, Anderson testified that he removed the eye patch and Anderson could see that Suspect Hyatt's left eye socket was caved in because of the missing eyeball. Tr. at 141–42.

Anderson also testified credibly that he had informed Agent Kowalski of the drastic change in Suspect Hyatt's appearance. Anderson specifically recalled telling Agent Kowalski in the Chicago federal courthouse, after he had pled guilty, that Suspect Hyatt had been in an accident and had lost his left eye. Tr. at 154. The record unequivocally indicates that Anderson testified at Everett Tracy's criminal trial on February 14, 1984, that Suspect Hyatt had been in an auto accident and had suffered the loss of his eye and had "big scars" on his face. Tr. at 182–83. Although Agents Kowalski and Fanter attended at least parts of the Everett Tracy trial, Tr. at 42, 4, 12, it is not clear whether the agents heard Anderson's specific testimony regarding Suspect Hyatt's auto accident. Tr. at 183. It is evident, however, that the Assistant United States Attorney ("AUSA") prosecuting the Everett Tracy case, Daniel Murray ("Murray" or "AUSA Murray"), would certainly have heard Anderson's testimony. *See* Tr. at 50. Finally, Anderson testified credibly at the trial of this case that he also specifically remembers talking to Agent Kowalski about Erroll Hyatt's car accident and lost eye immediately after he had testified at the Tracy trial, and on other occasions as well. Tr. at 155–57.

The Court found Anderson's testimony that he had informed Agent Kowalski several times in 1984 that Suspect Hyatt had lost his eye to be extremely credible. In addition to having observed Anderson give his testimony in what appeared to be an honest manner, the Court notes that his overall story was consistent with having informed the agent of Suspect Hyatt's changed appearance. Specifically, Anderson had been cooperating with the DEA since 1981, and by 1984, he observed that while he had pled guilty to a drug offense, the main operator behind the smuggling ring, Erroll Hyatt, remained free. Further, as the government itself brought out at trial, Anderson had apparently been kidnapped at one point by Suspect Hyatt. For those reasons as well, the Court finds that Anderson had a strong motive to ensure that the DEA capture Suspect Hyatt, and that in accordance with that motive, he did, in fact, make an affirmative effort to inform Agent Kowalski in 1984 and again in later years that Suspect Hyatt had lost an eye. *See, e.g.,* Tr. at 156–57. While Agent Kowalski testified that he had no recollection of being given that information, and that he learned about Suspect Hyatt's missing eye for the first time in September 1990, Tr. at 181, the Court found Kowalski's testimony inconsistent, and credits Anderson's testimony on this point.

Despite the new, clearly useful information for identifying Suspect Hyatt, which this Court finds Agent Kowalski had in 1984 from conversations with Anderson, and which AUSA Murray had from observing Anderson's 1984 courtroom testimony, nothing regarding the warrant for Earl Hyatt was amended, and no mention of the suspect's unique physical attribute was made in the DEA file. Indeed, the warrant continued to indicate that the wanted man resided in "Belize City, Jamaica." The DEA file reports, on the other hand, consistently indicate that the suspect resided in Kingston, Jamaica, even as the suspect's continued activity was being recorded.

Meanwhile, Plaintiff Hyatt had eventually entered the United States in 1982, and subsequently settled in New York. Tr. at 108, 125. In 1988, Plaintiff Hyatt had gone to the INS offices at Federal Plaza in New York City to obtain a work permit, and at that time the INS had required him to submit his Jamaican passport. Tr. at 109. Two years later, after receiving a letter from the Jamaican consulate directing him to get a medical examination in Jamaica so that his green card could be updated, Plaintiff Hyatt returned to

the INS at Federal Plaza to reacquire his passport. Tr. at 109. On May 25, 1990, Plaintiff Hyatt waited in the INS offices for his passport when he was suddenly placed under arrest pursuant to the 1983, long inaccurate arrest warrant. Tr. at 110. Plaintiff was then placed in the custody of the New York Metropolitan Correction Center ("MCC"). Tr. at 111.

AUSA Murray—the same AUSA who had prosecuted Everett Tracy and had heard Anderson's testimony in that case—called Agent Kowalski to inform him that Earl Hyatt had been arrested in New York. Tr. at 66. Agent Kowalski suggested that Agent Fanter be the one to go to New York to identify Hyatt, because Fanter had been the only agent to personally meet the suspect back in 1981. Tr. at 48, 67. Following Kowalski's suggestion, Murray called Fanter, and Fanter went to the June 1, 1990 commitment hearing, which was conducted before the Honorable Naomi Reice Buchwald, United States Magistrate Judge, in the Southern District of New York. Tr. at 22. Because Plaintiff Hyatt's lawyer at the time had objected at the hearing, Agent Fanter was not able to personally see Plaintiff Hyatt to make the identification, and instead made the identification from a photograph, apparently taken from plaintiff's Belize identification card. Tr. at 12–13.

Agent Fanter stated that the person in the photograph, presented to him at the New York hearing, "looked almost identical" to the suspect. Tr. at 13. Agent Fanter made this identification based on a single, one-hour long meeting with Suspect Hyatt that had occurred almost *nine* years before. Tr. at 13–14. Agent Fanter did not inform Magistrate Judge Buchwald that a reliable informant who personally knew the suspect had testified in 1984, under oath, that the wanted man had lost his left eye in an accident, because neither Agent Kowalski nor AUSA Murray, who had such information, had noted it in the DEA file or in the information on the 1983 arrest warrant. Based on the record of this case, Agent Fanter also failed to inform Magistrate Judge Buchwald that there were discrepancies between the information the DEA had amassed about the sus-

pect and the information regarding plaintiff, including the fact that: (1) Suspect Hyatt was medium complected, Tr. at 6–7, while plaintiff has very dark skin, Tr. at 105; and (2) Suspect Hyatt was reported, consistently over several years, to have been living in Kingston, Jamaica, Tr. at 40, while plaintiff had lived in Belize City, Belize from 1980 to 1982, and in New York from 1982 until 1990. Instead, Agent Fanter simply looked at a photograph of plaintiff and stated with alleged certainty that it was the man he had met in 1981.

Based on this ostensibly positive identification, which omitted available, contrary information, Magistrate Judge Buchwald agreed with the government to have plaintiff remain in custody in New York. Plaintiff was eventually moved to Chicago in mid-June after delays and detours took him to upstate New York, Oklahoma, Detroit, and Indiana. Tr. at 111–13.

Upon plaintiff's arrival in Chicago, neither AUSA Murray nor the DEA agents ever made further efforts to more positively identify plaintiff, despite the fact that all three were aware that Agent Fanter had made an identification based on a nine-year old, single, one-hour encounter with Suspect Hyatt, and despite the fact that AUSA Murray and Agent Kowalski had been informed by Anderson's statements in 1984 that Suspect Hyatt had the distinct physical trait of having only one eye.

In addition, the Court notes that after speaking to AUSA Murray and being informed of Hyatt's arrest, Agent Kowalski got in touch with James Anderson, to see whether Anderson was still willing to testify against Hyatt. Tr. at 67. It would have been evident to anyone familiar with the indictment, as AUSA Murray and Agent Kowalski were, that the coconspirators involved in the drug smuggling ring, all indicted together, had the best personal knowledge and memory of Suspect Hyatt's appearance. Thus, although Murray and Kowalski had knowledge that the basis for Agent Fanter's identification of the suspect was relatively weak, and although they were in contact with James Anderson and another informant, Frank Grover, both of whom clearly had

substantially more contact with Suspect Hyatt and therefore had more of a basis to identify him, the government made no effort to have Anderson or Grover identify the person in custody, even through photographs. Instead, the government continued to rely on a file which had mistakes already incorporated into it, and chose to rely on the single, inherently questionable identification made by Agent Fanter at the New York hearing.

Plaintiff ultimately remained incarcerated from May 25 to September 7, 1990, when District Court Judge Duff granted plaintiff's application to be released. Tr. at 94, 134. Plaintiff's court-appointed lawyer, Frank Wesolowski ("Wesolowski"), obtained documents from Belize, including voting and employment records, which clearly evidenced Plaintiff Hyatt's presence in Belize from 1981–82. Tr. at 92. In addition, Wesolowski read the 1984 Everett Tracy trial transcript, and learned that James Anderson had testified that Suspect Hyatt had only one eye. Tr. at 93. From that information, Wesolowski eventually requested that AUSA Murray arrange a photograph line-up with an informant who would be more knowledgable of Suspect Hyatt's appearance than Agent Fanter. Tr. at 93, 81–84. The informant, Frank Grover, did not recognize plaintiff in the line-up, nor when his photograph was singled out for identification. Tr. at 83–85. Finally, in October 1990, after plaintiff had been released and had returned to New York, AUSA Murray arranged for plaintiff's eyes to be examined, at which point it was confirmed that he had two functioning eyes. Tr. at 89, 114. Based on these efforts, the charges against plaintiff were finally dismissed with prejudice on October 22, 1990. Tr. at 95; Ex. 24.

B. *Conclusions of Law.*

1. *Choice of Law.*

■ The liability of the federal government under the FTCA is generally determined by state law. The FTCA provides, in part, that:

[T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or

personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*

28 U.S.C. § 1346(b)(1)(emphasis added). Plaintiff makes no arguments regarding the choice of law to be applied to this case and assumes instead that New York law applies. The government, on the other hand, argues that Illinois law applies to this case.

■ Under the FTCA, this Court must apply the whole law of the state in which the acts of negligence occurred, including the choice-of-law rules of that state. *Richards v. United States,* 369 U.S. 1, 11–13, 82 S.Ct. 585, 591–93, 7 L.Ed.2d 492 (1962). In this case, the acts or omissions causing plaintiff's arrest and incarceration clearly occurred in Illinois. The DEA investigation of the narcotics conspiracy, of which plaintiff was mistakenly identified as being a part, took place in Illinois. The initial, mistaken incorporation of INS information regarding plaintiff into the DEA's investigation report occurred in Chicago. Plaintiff was taken into custody in New York, but was detained and ultimately imprisoned based largely on the mistaken information that was contained in the Chicago DEA's investigative reports. And, while DEA Agent Fanter misidentified plaintiff at the magistrate's hearing in New York, that was simply one New York act among several more significant Illinois acts. Finally, most of plaintiff's incarceration took place in Illinois, and any negligence on the part of the government in not confirming plaintiff's identification upon his arrival in Chicago and upon the government's contact with Suspect Hyatt's coconspirators, also took place in Illinois. Because the acts or omissions causing plaintiff's lengthy incarceration occurred in Illinois, this Court must apply Illinois' choice-of-law rules. *See id.*

■ Illinois has adopted the "most significant relationship" test to determine the applicable law in a tort case. *See Miller v.*

*Long–Airdox Company,* 914 F.2d 976, 978 (7th Cir.1990) (citing, among others, *Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593 (1970)). This test requires the Court to examine the following four factors as they relate to this case: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the parties' domiciles, residences, places of incorporation, and places of business; and (4) the place where the parties' relationship, if any, is centered. *Id.* The first two factors of the above list are generally considered the most important, and the presumption that the law of the state where the injury occurred will govern is difficult to overcome, where the conduct causing the injury occurred in the same state where the injury occurred. *Id.*

■ Examining these factors in the instant case leads the Court to conclude that Illinois law is applicable to plaintiff's claims. As discussed above, the acts or omissions causing plaintiff's injury occurred almost entirely in Illinois. In addition to the Chicago DEA investigation led by Agents Fanter and Kowalski, the grand jury which indicted plaintiff was convened in Chicago, the indictment was handed down in Chicago, and the arrest warrant for plaintiff was signed by a Chicago federal judge. Although plaintiff was initially arrested in New York, most of his injury took place in Illinois, because most of his incarceration took place there. In short, the only factor weighing against the application of Illinois law is that plaintiff's domicile is New York. Considering all of these factors, the Court finds that Illinois has the "most significant relationship" with plaintiff's tort claims, and that Illinois law therefore applies to those claims.

### 2. *The Illinois Tort Immunity Act.*

■ Defendant argues first that this Court should apply the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Illinois Tort Immunity Act") to plaintiff's claims, and that in accordance with that Act, the Court should require a showing of "willful and wanton" conduct on the part of government officials before the United States is held liable. 745 Ill. Comp. Stat. 10/2–202 (West 1997) ("A public em-

ployee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct").

The FTCA provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, *in the same manner and to the same extent as a private individual under like circumstances . . . .*" 28 U.S.C. § 2674 (emphasis added). The government argues that this Court should follow the Fifth and Ninth Circuit Courts of Appeals, which have determined that because there is no private individual whose role is analogous to that of the federal sovereign in enforcing laws, a court should look to the liability of state and municipal entities to assess the liability of the federal government. The Ninth Circuit has stated:

> The circumstances here involve government employees in a law enforcement function. Questions as to the power and authority to arrest, to maintain custody, and to lawfully restrict a person's liberty, are unique to the law enforcement function. Because private persons do not yield such police powers, the inquiry into the government's liability in this situation must include an examination of the liability of state and municipal entities "under like circumstances."

*Louie v. United States,* 776 F.2d 819, 825 (9th Cir.1985). *See also Crider v. United States,* 885 F.2d 294, 296–97 (5th Cir.1989) (citations omitted), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990). In accord with that reasoning, one Illinois District Court applied the Illinois Tort Immunity Act to a federal police officer's conduct in engaging in a high speed chase, and held that the United States would be liable for the officer's conduct only if he had acted wantonly and willfully. *Estate of Warner v. United States,* 743 F.Supp. 551, 554 (N.D.Ill.1990).

■ The Second Circuit, however, has not adopted the approach of examining and applying the liability of state and municipal entities to the federal government's conduct "under like circumstances." Indeed, the Second Circuit reversed a district court that had applied substantive New York State law

which immunizes police officers' conduct that is merely negligent and not done in bad faith. *Castro v. United States,* 34 F.3d 106, 111 (2d Cir.1994). The court stated:

[I]n seeking to apply the substantive law of New York, the district court looked to *Kolko v. City of Rochester,* 93 A.D.2d 977, 461 N.Y.S.2d 650, a case that did not deal with "private person[s]" but rather dealt with public officials. *Kolko* concerned the limited immunity that police officers enjoy when carrying out their official duties in good faith. It did not deal with the liability to which a private individual would be subject if he broke into the home of another and caused personal injury or property damage. Whatever other immunities the relevant state law may confer upon a private individual, [citation omitted], it is clear that private individuals do not possess the immunities of government officials. See *Wyatt v. Cole,* 504 U.S. 158, 163–69, 112 S.Ct. 1827, 1831–34 118 L.Ed.2d 504 (1992).

*Id.* Applying this reasoning to the arguments presented by the government, this Court does not find it appropriate to apply the Illinois Tort Immunity Act to plaintiff's claims. The FTCA's language clearly states that "[t]he United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances[,]" 28 U.S.C. § 2674, and it is clear that a private individual making a citizen's arrest, or a private shopowner who falsely imprisons a shopper or employee for stealing, or, finally, a private individual who prosecutes a civil action against another individual, is not afforded the protection of the higher "willful and wanton" standard which the Illinois Tort Immunity Act affords to Illinois government officials.[4]

### 3. *False Arrest and Imprisonment.*

■ "The essential elements of a cause of action for false arrest or false imprisonment are that the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." *Meerbrey v. Marshall Field & Co., Inc.,* 139 Ill.2d 455, 151 Ill.Dec. 560, 569, 564 N.E.2d 1222, 1231 (1990) (citations omitted). It is undisputed in this case that plaintiff was arrested by defendant on May 25, 1990, and was restrained by the government by being held in custody until September 7, 1990. The parties dispute whether the arrest and restraint were based on reasonable or probable cause.

■ The arrest itself, which took place on May 25, 1990, was based on an outstanding warrant that had been signed by an Illinois District Court judge on October 12, 1983. That arrest warrant, in turn, was based on the mistaken incorporation of plaintiff's INS record into a DEA investigation file. The Court notes that even in 1983, there were several indications—which a person proceeding with reasonable caution would have observed—that the INS record was inconsistent with DEA descriptions of Suspect Hyatt. For example, there was the discrepancy between plaintiff's address in Belize City, Belize, and consistent reports that the actual suspect had always resided in Kingston, Jamaica. In fact, the DEA had a telephone number for the suspect at the Kingston location, although that lead was never pursued.

■ Along with such discrepancies, however, the Court also notes that there were similarities between the INS profile and the DEA reports. Besides their obviously similar names, both men were of similar height and weight, were approximately the same age, and both had been born in Jamaica. Considering the totality of circumstances *as they stood in 1983,* the Court finds that it was not unreasonable for DEA agents and the AUSA to have requested an arrest warrant based on the information which the INS had provided. Reasonable, or probable cause "is a fluctuating concept; its existence

---

4. In any event, "the term 'willful and wanton' in the law of Illinois is unclear. It may be little stronger than negligence." *Boyce v. Fernandes,* 77 F.3d 946, 951 (7th Cir.1996) (citation omitted). Even if this standard were to apply to the government's actions, plaintiff has proved willful and wanton conduct to the extent that his incarceration continued unreasonably after he arrived in Chicago and the government had the opportunity to make a more firm identification with the cooperation of Anderson or Grover.

depends upon factual and practical considerations of everyday life. It is the totality of circumstances, including the facts available to defendant, that are dispositive. Police officers are allowed to make mistakes, but those mistakes must be reasonable ones." *BeVier v. Hucal*, 806 F.2d 123, 126 (7th Cir.1986) (internal quotations and citations omitted). As the information stood in 1983, the mistake of incorporating the INS record into Suspect Hyatt's file, and issuing an arrest warrant based on that information was a reasonable one.

 Mistakes and omissions made on the part of the government *after* the 1983 arrest warrant was issued, however, accumulated to dissipate the reasonableness of relying on that initial error, and cause, in part, this Court to find that the actions which the government took in 1990 against plaintiff to have been grossly negligent. Despite new information that both Agent Kowalski and AUSA Murray obtained in 1984 that Suspect Hyatt was missing his left eye, there was no evidence that either Kowalski or Murray made any effort to amend the 1983 arrest warrant, or to otherwise note this significant identifying trait in Suspect Hyatt's file. Such a clearly unreasonable, and indeed ultimately dangerous, omission is unfortunately consistent with the government's careless approach to this case, and with its tendency to ignore facts that did not fit in with its investigation. For example, the blatant error evident on the face of the 1983 arrest warrant that Belize City is located in Jamaica was never corrected over the seven years that it was outstanding. Such a mistake reflects how the government was capable of ignoring any inconsistency in the information it had received from the INS (indicating that the suspect lived in Belize City, Belize) with the information it had consistently gathered and reported regarding Suspect Hyatt (indicating that the suspect lived in Kingston, Jamaica).

The Court also finds that the government was absolutely unreasonable in relying on Agent Fanter's "positive" identification of plaintiff at Magistrate Judge Buchwald's hearing. The Court finds that, based on all the information that the DEA and AUSA Murray had amassed regarding Suspect Hyatt, a reasonable person would have viewed Agent Fanter's identification as blatantly unreliable. First, the government itself admits that Fanter's "positive" identification of Hyatt was based on a single, one-hour long meeting which Fanter had with Suspect Hyatt almost *nine* years before. Second, although Agent Kowalski and AUSA Murray had learned in 1984 that Suspect Hyatt had lost his left eye, neither of them had made *any* notation in Suspect Hyatt's file to that effect, and accordingly, neither Agent Fanter nor Magistrate Judge Buchwald could take that significant fact into consideration. Third, Agent Fanter apparently did not relate to Magistrate Judge Buchwald that the DEA file reports, from 1981 until 1990, based on various sources of information, had *consistently* indicated that Suspect Hyatt lived in Kingston, Jamaica. Tr. at 40. Thus, the fact that Plaintiff Hyatt had lived in Belize City, Belize from 1980 to 1982, and had lived in New York from 1982 until 1990 was apparently ignored. Finally, although Agent Fanter, after meeting with Suspect Hyatt in 1981, had described the suspect as having a medium complexion, Tr. at 6–7, and although other informants also described the suspect as having a medium complexion, Tr. at 139–41, he apparently ignored that detail when identifying plaintiff through a photograph which would have clearly shown that plaintiff has a very dark complexion. Tr. at 105. Based on all of these facts, of which the DEA and AUSA Murray reasonably should have been fully aware on June 1, 1990, this Court finds that the government's reliance on Agent Fanter's identification of plaintiff at the New York hearing was clearly unreasonable and grossly negligent. The Court further finds that both AUSA Murray and Agent Kowalski could have easily and quickly corrected their error by having the informants Anderson and/or Grover—who clearly had better personal knowledge and memory of Suspect Hyatt's appearance than Agent Fanter, and with whom the government was in contact—identify whether plaintiff was Suspect Hyatt.

 In its post-trial brief, the government inaccurately points only to the action which it "affirmatively" took with regard to

plaintiff's identification. For example, the government points out that Agent Fanter, the only DEA agent to have personally met with the suspect, was the one chosen to attend the New York hearing, and that he was sent from Chicago to make the identification. The government also relies on its consistent, and allegedly reasonable error in noting that Suspect *Erroll* Hyatt was called *Earl* Hyatt. Whether either of those actions were in and of themselves "reasonable," however, does not divest the government of liability. Instead, the focus here is on the fact that the government, on numerous and significant occasions, unreasonably *failed* to act. Over time, these omissions accumulated to include: (1) the failure of the DEA to follow up on a Kingston, Jamaica telephone number allegedly belonging to Suspect Hyatt, and through which the DEA might have obtained a proper photograph or address for the suspect; (2) Kowalski and Murray's failure in 1984 to memorialize the fact that Suspect Hyatt had lost his left eye; (3) the government's failure, from 1983 until 1990, to note that the outstanding warrant included the mistake that Belize City is in Jamaica; and (4) the government's failure to use cooperating witnesses in Chicago to provide a clearly more reliable identification of the person in its custody. In short, this Court must examine not only what action the government took, but also what action it failed to take, and the Court must consider the totality of these facts as a whole in determining whether the government had reasonable grounds for arresting plaintiff, and then for incarcerating him for almost three and a half months.[5]

▆▆ The Court reiterates that there was a reasonable basis in 1983 for an issuance of the arrest warrant. For that reason, and because "the law is well settled that if an arrest is made under a judicially issued arrest warrant, the arrest itself cannot give rise to a claim of false imprisonment[,]" *Davis v. Temple*, 284 Ill.App.3d 983, 220 Ill.Dec. 593, 598, 673 N.E.2d 737, 742 (1996)

(emphasis added) (citing *Weimann v. County of Kane*, 150 Ill.App.3d 962, 104 Ill.Dec. 110, 113, 502 N.E.2d 373, 376 (1986) and *Jacobson v. Rolley*, 29 Ill.App.3d 265, 330 N.E.2d 256, 258 (1975)), the Court does not find that the government is liable for the actual arrest of plaintiff on May 25, 1990. "However, the Illinois Supreme Court and th[e Illinois Appellate Court] have held that false imprisonment may result from an unlawful detention following an otherwise legal arrest." *Weimann v. County of Kane*, 150 Ill.App.3d 962, 104 Ill.Dec. 110, 113, 502 N.E.2d 373, 376 (Ill.App.Ct.1986)(citing *Fulford v. O'Connor*, 3 Ill.2d 490, 121 N.E.2d 767 (1954) and *Hughes v. New York Central System*, 20 Ill.App.2d 224, 155 N.E.2d 809 (1959)). This Court has found that the government unreasonably relied on, and failed to correct, Agent Fanter's identification of plaintiff at Magistrate Judge Buchwald's hearing, and that it specifically ignored significant facts which would have quickly and easily led to a correction of the error. Accordingly, from June 1 until September 7, 1990, the government "acted without having reasonable grounds to believe that an offense was committed by the plaintiff[,]" *Meerbrey v. Marshall Field & Co., Inc.*, 151 Ill.Dec. at 569, 564 N.E.2d at 1231 (citations omitted), and the government's gross negligence in this regard requires the Court to find defendant liable to plaintiff for that ninety-nine day period of false imprisonment.

4. *Malicious Prosecution.*

▆▆ In order to succeed with his malicious prosecution cause of action, plaintiff must establish the following elements: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. *Swick v. Liautaud*, 169 Ill.2d 504, 215 Ill.Dec. 98, 102, 662 N.E.2d 1238, 1242 (1996) (citations omit-

---

**5.** The government also implies in its post-trial brief that this Court should consider plaintiff's "checkered" immigration history as evidence that he himself somehow contributed to the three-and-a-half month imprisonment. The

Court finds such an implication both irrelevant and offensive. The locus of this case is on the government's actions or omissions with regard to the plaintiff, and not the plaintiff's immigration history.

ted). The first two elements have been clearly established. A criminal indictment and the arrest warrant of Earl Hyatt, who had resided at 92 New Road, Belize City in 1980, was issued in 1983, and AUSA Murray continued that prosecution upon plaintiff's arrest in 1990. Additionally, the criminal proceeding terminated in plaintiff's favor when Judge Duff granted the government's motion to dismiss the indictment against defendant Earl Hyatt with prejudice. Ex. 24.

■ The Court also finds that there was an absence of probable cause in 1990 for the government to continue the criminal proceeding against plaintiff. Probable cause is " 'such a state of facts, in the mind of the prosecutor, as would lead a man of ordinary action and prudence to believe or entertain an honest and sound suspicion that the person accused is guilty' " *Mangus v. Cock Robin Ice Cream Co.* 52 Ill.App.3d 110, 9 Ill.Dec. 769, 773, 367 N.E.2d 203, 207 (1977) (quoting *Carbaugh v. Peat*, 40 Ill.App.2d 37, 189 N.E.2d 14, 19 (1963)). In the instant case, as discussed at length above, a person of ordinary action and prudence would not have relied on Agent Fanter's identification of plaintiff and would have acted to quickly confirm plaintiff's identity. Instead, the government acted in a grossly negligent manner by ignoring significant facts that pointed to plaintiff's misidentification and innocence.

■ As to the fourth element, plaintiff contends that malice should be inferred from the absence of probable cause. There are Illinois cases that support this proposition. As one court has stated, however, "[w]hether malice may be inferred depends upon the facts in each case. It could be inferred, for example, if it were established that the prosecutor had a motive other than one of bringing a guilty party to justice, or if the prosecution were so devoid of merit that its very baselessness would suggest a wanton purpose." *Hughes v. New York Central System*, 20 Ill.App.2d 224, 227, 155 N.E.2d 809, 812 (1959). Plaintiff failed to put on any evidence that would suggest the first of these examples. And, although the second example is supported by some of the evidence, the Court does not find that the prosecution of plaintiff suggests a wanton purpose, and

therefore declines to infer that malice was present in this case. Additionally, outside of the damage incurred by the false imprisonment, plaintiff did not put on any evidence at trial regarding the specific damage he may have suffered from being prosecuted as a drug smuggler. Because plaintiff has failed to establish the fourth and fifth elements of his malicious prosecution claim, that claim is dismissed.

### 5. *Negligence and Gross Negligence.*

■ Plaintiff's claims against the United States for its negligent and/or grossly negligent actions regarding his arrest and imprisonment are redundant because they are necessarily a part of the false arrest and false imprisonment claims. Specifically, the false arrest and false imprisonment claims required that the plaintiff show that the government acted unreasonably in issuing an arrest warrant and in imprisoning him from May 25 until September 7, 1990. Accordingly these claims were addressed by the discussions above, and need not be addressed separately.

### 6. *Damages.*

■ Plaintiff's showing at trial regarding the damage he suffered from the government's acts and omissions was limited to his own testimony of how he was incarcerated and sometimes shackled when he was moved from one city to another. No testimony or evidence was presented regarding any lost wages or post-imprisonment stress or emotional harm. Accordingly, this Court finds that plaintiff's damage is limited to the loss of liberty he suffered during the ninety-nine days that he was incarcerated by the government without any reasonable basis. Illinois courts have permitted a variety of damage awards for loss of liberty. *See Adams v. Zayre Corp.*, 148 Ill.App.3d 704, 102 Ill.Dec. 121, 499 N.E.2d 678 (1986) ($2,500 for forcible arrest and approximate half-hour false imprisonment); *Ferrell v. Livingston*, 344 Ill.App. 488, 101 N.E.2d 599 (1951) ($15,000 for 28 hours confinement and the effects of malicious prosecution) *Lindquist v. Friedman's Inc.*, 285 Ill.App. 71, 1 N.E.2d 529 (1936)($750 for approximately

two hours of false arrest and imprisonment), *aff'd*, 366 Ill. 232, 8 N.E.2d 625 (1937). *See also Rothschild v. The Drake Hotel, Inc.*, 397 F.2d 419 (7th Cir.1968) (affirming an award of $75,000 for three days confinement). Considering these cases, and noting, as one court has, that " '[h]uman liberty is difficult of measurement in dollars and cents[,]' " *Van Schaick v. United States*, 586 F.Supp. 1023, 1034 (D.S.C.1983) (quoting *Wright v. Gilbert*, 227 S.C. 334, 88 S.E.2d 72, 75 (1955)), this Court awards plaintiff the amount of $297,-000.00 in compensatory damages for the ninety-nine days that he was falsely imprisoned.

Although plaintiff also requests punitive damages in the amount of $500,000.00, the FTCA does not allow for such damages, and his request is therefore denied. *See* 28 U.S.C. § 2674.

### CONCLUSION

For the reasons stated above, the Clerk of the Court is directed to enter judgment in favor of plaintiff on his false imprisonment claim, and the government is directed to pay plaintiff the award of damages in the amount of $297,000.00.

SO ORDERED.